IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FREDERICK P. HENRY            *
                             *
        v.                   *            Civil No. JFM-04-979
                             *
ROBERT PURNELL                *
                          *****

OPINION

Frederick Henry has brought this action against Robert Purnell, a Somerset County

Deputy Sheriff, asserting excessive force claims under the Fourth Amendment and Articles 24

and 26 of the Maryland Declaration of Rights.  Discovery has been completed, and Purnell has

moved for summary judgment.  The motion will be denied.

I.

On October 9, 2003, an arrest warrant was issued for Henry for failing to obey a court

order to either pay his child support arrearage or report to a detention center to serve a jail

sentence for failure to pay. On October 20, Purnell went to Henry's last known address in Eden,

Maryland, in an attempt to arrest him.  The officer discovered Henry at that address but Henry

avoided arrest by lying about his identity.  Soon thereafter, Purnell learned that the man he had

talked to was in fact Henry.  Three days later, Purnell noticed Henry in a passing truck, followed

him, and pulled into a driveway alongside the truck.  Purnell ordered Henry out of the truck.

Henry complied but fled before he could be handcuffed.  Purnell claims Henry pushed him in the

course of escaping; Henry denies that occurred.  In any event, Purnell pulled out a Glock .40

caliber handgun and shot the fleeing Henry in the elbow.  Henry stopped running and was

arrested.

The parties have stipulated that Purnell did not intend to shoot Henry with his handgun.

Rather, he intended to unholster and discharge his Taser, a non-lethal device that immobilizes a suspect via an electro-muscular disruption.  The Taser was holstered on Purnell's right side, just below his holstered handgun.  Purnell has testified on deposition that he reached for the Taser because he felt endangered by Henry's actions.  He asserts that he thought Henry might be running to get a weapon.

Purnell did not realize he had fired the handgun until after the weapon discharged.  He immediately told Henry and another witness at the scene that he had not meant to shoot Henry and that he had grabbed the wrong weapon.

## II.

Purnell first argues that Henry's claims are not viable either under the Fourth Amendment or the Maryland Declaration of Rights because no seizure occurred.

The Supreme Court has made it clear that a seizure under the Fourth Amendment requires "an intentional acquisition of physical control."  *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989).   As the Court noted, an element of willfulness "is implicit in the word 'seizure,' which can hardly be applied to an unknowing act."  *Id.*  It has therefore been held that there is no seizure when a police officer unintentionally discharges a weapon, causing injury or death.  *See, e.g., Glasco v. Ballard*, 768 F. Supp. 176, 180 (E.D. Va. 1991); *Troublefield v. City of Harrisburg*, 789 F. Supp. 160, 166 (M.D. Pa.), *aff'd* 980 F.2d 724 (3d Cir. 1992).  *See also Campbell v. White*, 916 F.2d 421, 423 (7th Cir. 1990) (no seizure where state trooper accidentally collided with motorcyclist he had been chasing).

The present case is substantially different from *Glasco* and *Troublefield* in that although

Purnell did not intend to fire his handgun, he did intend to fire his Taser.[1]  Purnell argues, however, that this distinction is legally insignificant.  He cites language in *Brower* that "a Fourth Amendment seizure occur[s] . . . only when there is a governmental termination of freedom of movement *through means intentionally applied*."  *Brower*, 489 U.S. at 596-97.  According to Purnell, he did not seize Henry because the means by which he stopped Henry (the handgun) was not *the means* he intended to apply (the Taser).  On facts virtually identical to those presented here, one district court has adopted this reasoning.  *Torres v. City of Madera*, CV F 02-6385 AWI LJO, at 11 (E.D. Cal. Apr. 8, 2005) (unpublished opinion).

I believe that Purnell and the *Torres* court read *Brower* too narrowly.  Other language in *Brower* counsels against an overly restrictive interpretation of its holding.  "In determining whether the means that terminates the freedom of movement is the very means that the government intended we cannot draw too fine a line, or we will be driven to saying that one is not seized who has been stopped by the accidental discharge of a gun with which he was meant only to be bludgeoned, or by a bullet in the heart that was meant only for the leg."  *Brower*, 489 U.S. at 599.  Further, the Court stated, "[w]e think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result."  *Id.*  Here, as a factual matter, Henry was stopped by a projectile fired from the handgun, which was "the very instrumentality set in motion . . . in order to achieve that result."  More

---

[1]This case is also unlike the hypothetical posed in *Brower*, that subsequently came to real life in *Campbell* and *County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998), concerning an accident that occurs when a police car pursues a fleeing suspect with the intent to stop him by a show of authority.  In that situation, the police officer does not intend to acquire physical control over the suspect by colliding with the suspect's vehicle (or by causing the suspect's vehicle to crash), and thus there is no Fourth Amendment seizure.  Here, in contrast, Purnell did intend to stop Henry by shooting him with a projectile.

fundamentally, it is undisputed that Purnell intended to acquire physical control over Henry, whatever weapon he fired.  Under *Brower* that is the fact that ultimately is crucial.

III.

A.

Purnell next contends that he is entitled to qualified immunity on Henry's federal constitutional claim because he reasonably perceived that under existing law his use of force was reasonable within the meaning of the Fourth Amendment.[2]  *See generally Anderson*, 483 U.S.

---

[2]Purnell does not contend that he is entitled to qualified immunity on the ground that it is not clearly established that shooting someone with a handgun in the belief that a Taser is being fired constitutes a Fourth Amendment seizure.  If he made that contention, I would reject it.  Although I recognize that the *Torres* court has held to the contrary, *Torres* was decided in another jurisdiction, and, for the reasons I have stated, I find that the Supreme Court's decision in *Brower* clearly establishes that a seizure does occur under those circumstances.

Moreover, to apply the doctrine of qualified immunity under these circumstances would be purely mechanical.  It is not sufficient simply to review prior case law to ascertain whether there is a precedent "on all fours" or "nearly on all fours."  Rather, qualified immunity issues must be decided against the background, and with the objective of furthering, the purpose for which public officials are afforded qualified immunity: to prevent them from the cost, risks, and annoyance of harassing litigation that might fetter their conduct and hinder them in the performance of their duties.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982); *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  Here, assuming the law was not clearly established that a Fourth Amendment seizure occurs when an officer shoots a fleeing suspect with a handgun believing it to be a Taser, it certainly cannot be fairly said that Henry's lawsuit is "harassing."  His Fourth Amendment claim is, as I have held, based upon a correct reading of the holding in *Brower*.  (If I am wrong on this point, Henry's claim fails for the fundamental reason that there was no Fourth Amendment seizure).  Likewise, any asserted lack of clarity in the law would not have fettered Purnell's conduct or hindered him in the performance of his duties.  No reasonable officer would shoot a fleeing suspect with a handgun believing it to be a Taser on the ground that there was no judicial precedent precisely on point.  Nor would the officer's training be affected in any way by the absence of such a precedent.

In contrast, as stated in the text, *infra*, if the issue presented was whether Purnell is entitled to qualified immunity for having shot Henry with a Taser (the act he believed he was committing), the answer would be "yes."  In that event, it would be probable that Purnell's conduct did not violate Henry's Fourth Amendment rights at all.  However, even if the shooting of Henry with a Taser under the circumstances presented would have violated his Fourth Amendment rights, those rights were not clearly established at the time of the incident.

4

635 (defense of qualified immunity may be asserted in a Fourth Amendment excessive force

case).  In determining whether a police officer or other public official is entitled to qualified

immunity, courts are to follow a two-step process.  First, they are to ask whether, "[t]aken in the

light most favorable to the party asserting the injury, do the facts alleged show the officer's

conduct violated a constitutional right?"  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Second, if

the answer to the first question is yes, they are to further inquire "whether the right was clearly

established."  *Id.*  In deciding the second issue, "[t]he relevant, dispositive inquiry . . . is whether

it would be clear to a reasonable officer that his conduct was unlawful in the situation he

confronted." *Id.* at 202.[3]

---

Moreover, it might reasonably be said that the absence of any judicial precedent on point might
well have affected Purnell's decision-making process and the training he had received.  Thus, to
grant him qualified immunity under those circumstances would be consistent with the purpose of
the doctrine.

   [3]Under Fourth Circuit law, "a defendant's entitlement to qualified immunity under a
particular set of facts should be decided by the court, not by the jury."  *Willingham v. Crooke*,
412 F.3d 553, 560 (4th Cir. 2005).  Thus, a jury should not be instructed on the defense.
Although a defendant may, of course, ask the jury at trial to *find* in his favor facts that the court
has *viewed* in the light most favorable to the plaintiff when denying a summary judgment motion
raising the qualified immunity defense, determination of the viability of the defense remains
within the province of the court.
   The Fourth Circuit's ruling on this issue surely is correct for at least three reasons.  First,
the purpose of the qualified immunity doctrine to protect police officers and other public
officials from harassing litigation by weeding out unmeritorious claims, *see Harlow*, 457 U.S. at
814; *Anderson*, 483 U.S. at 638, is fulfilled if, after carefully examining the evidence in the light
most favorable to the plaintiff on a motion for summary judgment, the court determines that the
qualified immunity defense fails under the two-step analysis mandated by *Saucier*.  Second,
although (as stated in section IIIB, *infra*) juries are traditionally asked in civil cases to evaluate
the reasonableness of parties' *conduct*, they are entirely unequipped to answer the *Saucier*
inquiries, which necessarily require a review of relevant judicial precedents.  That obviously is a
function and the responsibility of judges.  Third, to instruct a jury on qualified immunity in a
Fourth Amendment excessive force case would be confusing, at best, and (despite the fact that in
the past defense counsel routinely requested such an instruction) unfairly detrimental to
defendants.  Because qualified immunity is an affirmative defense, a qualified immunity

Here, the answer to the question of whether Purnell is entitled to qualified immunity depends upon how the question is specifically framed.  On the one hand, if the question posed is whether Purnell is entitled to qualified immunity for shooting Henry with his handgun (the act he actually committed), the answer clearly is "no."  Numerous cases hold that an officer may not shoot a fleeing suspect where the suspect poses no immediate danger to the officer.  *See, e.g., Tennessee v. Garner*, 471 U.S. 1, 10-11 (1985) (police officer violated the Fourth Amendment when he used deadly force against unarmed, nondangerous fleeing suspect).[4]  Therefore, if Purnell's underlying intent not to fire a handgun is disregarded, his conduct did violate Henry's Fourth Amendment rights, and it would have been clear to a reasonable officer in his position that his conduct was unlawful.  On the other hand, if the question asked is whether Purnell is entitled to qualified immunity for having prevented Henry from fleeing by shooting him with a Taser (the act he believed he was committing), the answer would be "yes."  Plaintiff has cited no case, and I am aware of none, prohibiting an officer's use of a Taser against someone for whom there is an outstanding warrant and who previously avoided arrest.  Thus, if all that were considered is Purnell's intention to use a Taser, in all likelihood the first step of the *Saucier* test would be dispositive because Purnell's actions did not violate Henry's constitutional rights.  At the least, it would not have been clear to a reasonable officer standing in Purnell's position that his conduct was unlawful.

---

instruction would appear to place the burden upon the defendant to prove that he acted reasonably when, in fact, the burden is on a plaintiff to prove that the defendant's conduct was objectively unreasonable.

[4]Indeed, Purnell's own spontaneous statement at the scene that he had not intended to use his gun evidences that he himself recognized the unreasonableness of using a handgun rather than a Taser under the circumstances confronting him.

There is, however, a third way of stating the question that I find provides the key to correct analysis: is Purnell entitled to qualified immunity at this stage of the litigation despite the existence of disputed facts concerning the objective reasonableness of his belief that he was firing a Taser when he shot Henry with a handgun?  Framed in this fashion, the question must be answered in the negative.  Although indisputably Purnell subjectively believed he was using his Taser when he shot Henry, *Graham v. Connor*, 490 U.S. 386 (1989) expressly holds that in considering a civil claim based upon a Fourth Amendment seizure, an officer's subjective good faith is not a defense.  *Id.* at 397.  Rather, "the question is whether the . . . [officer's] actions are 'objectively reasonable' in light of the facts and circumstances confronting . . . [him], without regard to . . . [his] underlying intent or motivation."  *Id.*  "Objective reasonableness" is to be determined by such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight, . . . judged from the perspective of a reasonable officer on the scene . . . ."  *Id.* at 396.  Therefore, Purnell violated Henry's Fourth Amendment rights if, applying these criteria, his belief he was using a Taser was objectively unreasonable under the circumstances he was confronting, as he then reasonably perceived them to be.  Likewise, these rights were clearly established because under *Graham* it would have been clear to a reasonable officer that it was unlawful to use deadly force on the basis of an objectively unreasonable belief about the nature of the weapon being discharged.

I recognize, of course, that Purnell contends that his conduct was objectively reasonable.  Ultimately, a jury might agree with him.  However, in considering a summary judgment motion raising the defense of qualified immunity, the facts must be viewed most favorably to the

plaintiff.  *Saucier*, 533 U.S. at 201; *Clem v. Corbeau*, 284 F.2d 543, 550 (4th Cir. 2002).  Here,

various facts are relevant to the reasonableness of Purnell's actions, including (1) the nature of

the training Purnell had received to prevent incidents like this from happening, (2) whether he

acted in accordance with that training, (3) whether he would have discovered that he was holding

a handgun rather than a Taser if, as he apparently had been trained to do, he had attempted to flip

the thumb safety device on what he thought was the Taser, (4) whether Henry's trickery in

eluding him three days before heightened Purnell's sense of danger, warranting the need for

hurried action, or (5) whether Henry's earlier trickery angered Purnell, causing him to act with

undue haste and inconsistently with his training.  Resolution of any disputes about these facts

and the effect of the reasonable inferences to be drawn from them must await trial.

B.

(1)

There is another way to approach this aspect of the case which, though arguably

inconsistent with current law, would be simple, straightforward, and provide the basis for sound

analysis. I have chosen to discuss it because in my judgment the law relating to Fourth

Amendment civil claims has become somewhat incoherent and should be revamped in one

fundamental respect.  In my view, courts should explicitly hold that once it has been established

that an officer committed an intentional act constituting a Fourth Amendment seizure, a plaintiff

should be required to prove not only that the officer's actions were objectively unreasonable

under the *Graham v. Connor* criteria but also that the officer was malicious, reckless, or grossly

negligent - not merely negligent -  in committing the intentional act constituting the Fourth

Amendment seizure.[5] *Cf. Anderson*, 483 U.S. at 643-44 (holding that an officer is entitled to the defense of qualified immunity if he makes a "reasonable" mistake about whether under existing law a search is "reasonable" under the Fourth Amendment); *Daniels v. Williams*, 474 U.S. 327 (1986) (holding that merely negligent conduct does not give rise to a Fourteenth Amendment due process claim).

Otherwise stated, in my view what I will call a "heightened culpability element" should be explicitly added to a Fourth Amendment civil claim.[6]  In this case, because there is a clear

---

[5]It seems to me that imposition of liability for an officer's gross negligence in committing an intentional act constituting a Fourth Amendment seizure that was objectively unreasonable would be consistent with the purpose of the Fourth Amendment of protecting against unreasonable seizures - a purpose emphasized by the Court in *Graham v. Connor*.  However, determining whether a gross negligence standard properly balances the competing policy concerns presented in Fourth Amendment civil claim jurisprudence ultimately is an issue for the appellate courts to decide.  In the present case, there is sufficient evidence that Purnell acted recklessly to create a jury issue on that question.  Thus, if the case proceeds to trial, I will preserve the issue of the propriety of a gross negligence standard for possible appellate review by submitting a special verdict form which, after first asking the question whether the jury finds that Purnell's actions were objectively unreasonable, asks two follow-up questions to be answered in the event that the answer to the first question is "yes": whether the jury finds that Purnell acted recklessly and, if not, whether they find he acted with gross negligence.

[6]By proposing recklessness (and perhaps gross negligence) as an element of a Fourth Amendment civil claim, I am not suggesting that *Brower* or the accidental shooting cases it has spawned were incorrectly decided.  To the contrary, I think they are absolutely right in declaring that the commission of a reckless or grossly negligent act that was not intended by an officer as a means of acquiring physical control over a person does not constitute a seizure within the meaning of the Fourth Amendment.  I recognize that in this case, as discussed in section II, *supra*, there is a question under *Brower* whether Purnell's actions constituted a seizure, and if that question is answered in the negative, Henry does not have a federal constitutional claim. But a holding that an officer's shooting someone with a handgun when the officer believed he was firing a Taser does not constitute a seizure, while rendering what I am saying in this section of the opinion pure *dictum*, would not affect the point I am seeking to make.  Most acts giving rise to Fourth Amendment claims, e.g., firing a weapon knowing what the weapon is, or using a nightstick, indisputably were committed by an officer with the intent to acquire physical control over someone.

dispute as to whether Purnell acted recklessly or with gross negligence, those issues should be decided by a jury.

I recognize that, at least insofar as consideration of an officer's alleged malice is concerned, *Graham* may appear to militate against the addition of a heightened culpability element to a Fourth Amendment civil claim.  However, trial judges frequently give an instruction that mere negligence is not sufficient to give rise to a Fourth Amendment claim.  Such an instruction may be difficult to reconcile with a strict reading of *Graham*, because the "objective unreasonableness" test appears difficult to distinguish from the negligence standard applied in professional malpractice cases.  Nevertheless, the instruction reflects an institutional instinct that the fact an officer merely made a mistake should not be sufficient to give rise to civil liability under the Fourth Amendment.

This same instinct is reflected in appellate decisions.  When asked to review instructions in which the trial court has advised the jury that an officer's merely negligent actions do not give rise to liability under § 1983, circuit courts uphold them.  *See, e.g., Morrill v. Prince George's County, Maryland*, No. 95-3209, 1996 WL 692525 (4th Cir. Dec. 4, 1996).[7]  *Cf. Sturges v.*

_____

[7]*Morrill* may provide an instance in which the absence of a heightened culpability requirement as an element of a Fourth Amendment claim led to faulty analysis.  The instruction in question was upheld in large part based upon the court's characterization of the holding in *Brower* to be that "unintended consequences of government action could not form the basis of a Fourth Amendment violation."  *Morrill*, 1996 WL 692525, at *2.  This characterization is too broad.  In *Brower* the Court gave several examples of actions that would constitute a Fourth Amendment seizure and give rise to a civil claim even though the consequences of the government's actions were unintended: the stopping of the plaintiff "by the accidental discharge of a gun with which he was meant only to be bludgeoned or by a bullet through the heart that was meant only for the leg."  *Brower*, 489 U.S. at 599.  Indeed, the fatal collision involved in *Brower* itself was the unintended consequence of the roadblock the defendants had set up.

Perhaps all the court meant to say in *Morrill* is that in *Brower* the Supreme Court manifested a reluctance to hold officers liable for merely negligent conduct.  But if that is so, it

*Matthews,* 53 F.3d 659 (4th Cir. 1995).  They also sometimes find to be "objectively reasonable" actions that do not appear to be reasonable at all.  *See, e.g., Mazuz v. Maryland*, 442 F.3d 217 (4th Cir. 2006) (executing search warrant in violent manner at the wrong college dormitory room).  Likewise, they apply the qualified immunity doctrine to protect officers from liability for conduct that appears quite unreasonable.  *See, e.g., Waterman v. Batton*, 393 F.3d 471, 482-83 (4th Cir. 2005) (finding officers to be qualifiedly immune for shooting suspect driver when officers were no longer in zone of danger).  The need, manifested in these opinions, to protect officers from liability for difficult decisions they have to make under difficult circumstances is understandable.  But, in my judgment, explicit recognition that a degree of culpability greater than negligence is an element of a Fourth Amendment civil claim would provide a far cleaner and more forthright means of affording that protection.

I finally note that the establishment of a heightened culpability element to a Fourth Amendment civil claim would be far less violative of *Graham* than might appear at first blush. In *Graham* the Supreme Court was reviewing a divided opinion of the Fourth Circuit upholding the district court's granting of a directed verdict for police officers who, if plaintiff's version of events were found to be true, had engaged in conduct that was clearly unreasonable by any measurement.[8]  In making its ruling, the district court applied a standard taken from *Johnson v.*

---

supports my view that the appellate courts should so hold explicitly.

[8]According to the evidence produced by Graham (the only evidence, of course, before the district court when it granted defendant's motion for directed verdict), the facts were as follows. Graham, a diabetic, felt the onset of an insulin reaction and asked a friend to drive him to a nearby convenience store.  Graham entered the store but left immediately when he saw the long line at the checkout counter, and he asked his friend to drive him elsewhere.  Officer Connor witnessed Graham's hurried exit, grew suspicious, and made an investigatory stop of the car. Connor and other officers who later arrived on the scene ignored Graham's pleas for sugar, even

*Glick*, 481 F.2d 1028 (2d Cir. 1973) and found that the evidence was insufficient to establish that

the officers had not acted in good faith or had applied force "maliciously or sadistically for the

very purpose of causing harm."  *Graham v. City of Charlotte*, 644 F. Supp. 246, 248 (W.D.N.C.

1986).  The Supreme Court found this standard to be improper in cases arising under the Fourth

Amendment.  Contrasting the rights protected by the Fourth Amendment with the rights

protected by the cruel and unusual punishment clause of the Eighth Amendment, the Court held

that the "good faith" and "malicious and sadistic" test failed to focus upon the unreasonableness

of the seizure that had occurred, as the Fourth Amendment requires.  The Court then defined the

criteria to be applied in determining reasonableness, which included, as quoted earlier in this

opinion, "the severity of the crime at issue, whether the suspect poses an immediate threat to the

safety of the officers or others, and whether he is actively resisting arrest or attempting to evade

arrest by flight."  *Graham*, 490 U.S. at 396.  The Court also emphasized that the determination of

reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather

than with the 20/20 vision of hindsight."  *Id.*

The Court went on to say that "the question is whether the officers' actions are

'objectively reasonable' in light of the facts and circumstances confronting them, without regard

to their underlying intent or motivation."  *Id.* at 397.  Further expanding on the point, the Court

stated that "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an

objectively reasonable use of force; nor will an officer's good intentions make an objectively

---

after Graham passed out.  The officers manhandled him and threw him headfirst into a police
car, only to release him shortly thereafter upon receiving a report that Graham had done nothing
wrong at the convenience store.  In the encounter, Graham suffered a broken foot, cuts on his
wrist, a bruised forehead, and shoulder and ear injuries.  *Graham*, 490 U.S. at 388-90.

unreasonable use of force constitutional." *Id.*  Because of this language, and because of the

focus the Court directed to be placed upon the "objective reasonableness" of an officer's

conduct, post-*Graham* cases have not articulated heightened culpability as an explicit element of

a Fourth Amendment civil claim.

It is not entirely clear, however, that this was the Court's intended meaning (or that it

would have been the Court's intended meaning had it foreseen the confused manner in which the

law subsequently developed).  All that the Court held in *Graham* was that an officer's

"underlying intent or motivation" is immaterial and that application of the *Johnson v. Glick*

"good faith" and "malicious and sadistic" standard had been erroneous.  The Court did not hold

that an officer could be liable for mere negligence.  Moreover, there was no reason for the Court

to opine on the issue, given that the facts established by the plaintiff's evidence easily gave rise

to a reasonable inference that the officers had acted with recklessness or, at least, gross

negligence.[9]

In any event, however *Graham* is read, I believe the time has come for appellate courts

to revisit the issue of whether an element of culpability greater than negligence should explicitly

---

[9]There is one respect in which the heightened culpability element I propose would be inconsistent with the literal language of *Graham.*  Under my formulation, if a plaintiff proved that an officer's conduct was objectively unreasonable, he could meet his burden on heightened culpability by proving that the officer acted with recklessness, gross negligence, or *malice.*  The third of these factors relates to the officer's "underlying intent or motivation, " which *Graham* indicated was immaterial.  However, what was of concern to the Court in *Graham* was the misuse of the factor of intent and motivation in two ways: to render an officer liable for objectively reasonable conduct solely because he had subjectively bad intentions or to excuse him from liability for objectively unreasonable conduct solely because he had subjectively good intentions.  It is extremely doubtful that the Court intended that an officer's malice was immaterial in a third scenario: where the plaintiff was able to prove that the officer's conduct was objectively unreasonable *and* that he was motivated by malice.

be made a component of a Fourth Amendment civil claim.[10]  If it is made clear that an officer is

not liable on a Fourth Amendment civil claim unless he acted with malice, recklessness, or

perhaps gross negligence, an ancillary benefit would be that courts no longer would need to

overextend the defense of qualified immunity.  Nor would they have to strain to find objectively

reasonable conduct that juries (to whom in other civil cases decisions about the reasonableness

of a party's conduct are entrusted) might well find to be objectively unreasonable.  The balance

between preventing abuse by governmental authorities and protecting officials from harassing

litigation -- the competing policy interests upon which the doctrine of qualified immunity is

based, *see, e.g., Harlow*, 457 U.S. at 814, *Anderson*, 483 U.S. at 638 -- would then be better

struck.

(2)

The approach I have suggested, while adding a jury instruction concerning the

heightened culpability element of plaintiff's Fourth Amendment claim, would not lead to the

introduction of any different or additional evidence during the trial.  Counsel would remain free

to argue about whether or not Purnell's conduct was objectively reasonable.  However,

presumably they would also address whether or not he acted with recklessness or gross

negligence.  In all likelihood, this dual focus on objective reasonableness and heightened degree

of culpability would make the issues much more comprehensible to the jurors.  For them (as for

---

[10]Although I believe it is clear from what I have already said, I want to reiterate that I am not suggesting that reckless or grossly negligent conduct, unaccompanied by an underlying intentional act constituting a Fourth Amendment seizure, can give rise to a Fourth Amendment claim.  As *Brower* makes clear, the concept of a constitutional "seizure" necessarily implies an *intentional* act.  An officer's recklessness or gross negligence would become material only after the seizure has been established.

me), the abstract question of whether it is reasonable for an officer to shoot someone with a handgun while believing he is firing a Taser may be somewhat bewildering.  It seems virtually impossible to answer without reference to factors bearing upon the issue of whether the specific circumstances confronting Purnell caused him merely to make a mistake, i.e., to commit a negligent act,  or whether his disregard of the training he had received is so inexplicable that it demonstrates recklessness or gross negligence.

Of course, choosing the manner in which to present the case would be entirely up to counsel, and this forecast of their arguments is not intended to superimpose a mold upon them. However, anticipating what may occur at trial is useful in demonstrating that explicit recognition of the heightened culpability element I am proposing would bring to the law the greater coherence I believe is required, from the earlier stages of litigation, when the question of qualified immunity is being resolved, through counsel's closing arguments, in those cases where it is judicially determined that the defense of qualified immunity is not available.

## IV.

Purnell's final contention is that he is also entitled to statutory immunity as to Henry's state constitutional claim.  Maryland law is clear that common law public official qualified immunity does not apply in cases arising under Maryland's Declaration of Rights.  *See Okwa v. Harper*, 360 Md. 161, 201, 757 A.2d 118, 140 (2000); *Clea v. Mayor & City Council of Baltimore*, 312 Md. 662, 684-85, 541 A.2d 1303, 1314 (1988).  Under the Maryland Tort Claims Act, however, state officials are immune from liability for torts -- including constitutional torts -- committed within the scope of their duties and "made without malice or gross negligence."  Md. Code Ann., State Gov't § 12-105 (2006); Md. Code Ann., Cts. & Jud. Proc. §5-522(b); *see Lee v.*

*Cline*, 384 Md. 245, 266, 863 A.2d 297, 310 (2004) (holding that immunity under the Maryland

Tort Claims Act encompasses constitutional torts).  Purnell nevertheless is not entitled to

summary judgment on the state claim.  Although I agree that Henry could not prove that Purnell

acted with actual malice (in light of Purnell's spontaneous exclamation at the scene that he had

intended to use his Taser), the evidence on the summary judgment record is fully sufficient to

create a jury issue on the question of whether Purnell was grossly negligent.

A separate order denying Purnell's motion is being entered herewith.


Date: April 21, 2006                    /s/_____
                                        J. Frederick Motz
                                        United States District Judge